Thank you, Your Honor. May it please the Court, Kevin Lafke on behalf of Plaintiff Kenny Harris in this hostile work environment case. As you know, it's our position that what happened on May 18, 2007 alone should constitute, as a matter of law, a hostile work environment claim that could at least be determined by a jury and a decision made as to its severity and pervasiveness. I think there's a repeated effort by the employer in this case to characterize this event as two instances of using a severe racial epithet. In fact, you have multiple instances of that. The first incident with the Schwarzenegger comment, it occurs twice on one day in February. Then we have the May 18 event in which there's just a lengthy racist rant that is obviously severe and unacceptable, in which the word nigger is used repeatedly during that rant by one of plaintiff's supervisors. Then you have the later statement close in time to the May 18 event by another manager that essentially demeans plaintiff yet again and his race by saying that Hispanics, again using a racist epithet, could do a better job than plaintiff because he's black. When you look at this case in the light most favorable to plaintiff... I'm sorry, did they say because he was black or just say essays could do better than you? They said that, but... They didn't say because you're black, though. He didn't say because you're black. That was the implication is what you're arguing, but he didn't say that. I just want to make sure you're quoting what the record says is actually said. What the record says is a couple of things, Judge. First... About that statement. About the statement, a couple of essays could do a better job than you, Kenny, is the exact statement. Yeah, okay. And then plaintiff... He could have said that to a white person and been demeaning, perhaps to the people who were Hispanic, but the speech... Why would that be a racial epithet directed at him? Well, it's clear that plaintiff said he thought it was directed at his race in the context, the overall context of this employment relationship, and it's also clear that the speaker or a witness to that stated in his deposition, and I want to make sure that I... This is at ER 41. A witness to the statement here about Moll told him that blacks never work as well as Mexicans, and so you have Moll, the manager, making this statement to a third party, Fiesfeld, making that direct comparison, and so I think that it makes sense, then, to say that Harris interpreted this, plaintiff interpreted this in the right way, and he interpreted it as meaning this was directed at his race. Could I just ask you to then address... You've done a good job of laying out the incidents. We have case law in this circuit, at least an early case over my descent in Cortan, where there were some vice supervisors, a supervisors, some very, very anti-woman comments made, and our circuit law in Cortan and Vasquez does seem to say it takes something more than occasional horrific statements, it would appear. Now, how do you rationalize the facts here with the cases, these other cases? Well, I don't rationalize it. I'd simply urge you to look at the case law that we've cited in the blue brief at pages 7 and 8 about the severity and offensiveness of this particular word. Well, it's the word, so that's what you're really arguing. It's the word carries special demeaning and offensive character to it, so that should be the basis on which these two or three incidents should survive our law, which says offensive words that are not on a sustained basis, that are intermittent in the workplace should be sufficient to get you to the jury. Well, yeah, and I want to confirm that, because you say in your brief there was daily treatment. Now, did you mean by that that he was ill-treated, that people were mean to him, or were there other comments racial-based other than what occurs on February 7, 2007 and May 18, 2007? In other words, there are two days, two times that he was subjected to this. When you say daily treatment, are you referring to any racial-based type treatment? All of the race-based treatment is laid out in the blue brief and in the excerpt of record. When plaintiff talked about daily demeaning treatment, it was a generally demeaning treatment, not direct racial treatment. It's certainly our contention that in the light most favorable to plaintiff, a fact-finder could see this pattern of ignoring his complaints and in fact treating him worse after he complained about the indisputably racist treatment to be inappropriate under a hostile work environment. No, they didn't treat him worse. They promoted him. Well, you can't be given a pay raise of a dollar an hour or a promotion to endure racist treatment. That's not the law. Of course not, but I'm talking about his ill treatment. He was promoted after both these dates where there were racial-based comments made, right? That's exactly correct, and I think our colloquy shows why a fact-finder ought to be able to resolve these factual disputes and that he shouldn't be taken away from the fact-finder as a matter of law, as the district court did. Let me just respond one more thing, Judge, about the comment you made earlier. I would add a third incident. Again, when we talk about these as incidents, it's my argument that that minimizes it because in the two incidents that you talked about, there was repeated nasty comments made, but the third incident about the Hispanic slur and the comment that we talked about a minute ago here. So I think three incidents. Let me ask you this, if I can. I can well understand a case, whether this is such a case, I'm not saying, but I can well understand a case in which it's established by one or two incidents that there is racial animus using the N-word against a person, and those are the only two instances in which the N-word is used, but there is a lot of bad treatment in between or at other times, treating him worse than the other employees from which the inference could readily be drawn that the reason for the worst treatment is because of racial prejudice, as evidenced by the two overt incidents. Now, you say that that's what's happening, that he's being ill-treated, treated worse than the others during these other periods when he's not being called a nigger. What's your evidence for that disfavorable treatment? Well, for instance, when he complained to manager Moll about the treatment, Moll called him an SOB and told him to get out of his office. When he complained about the treatment, he was ridiculed, and his testimony and his declaration is he was treated worse afterwards. And in fact, when you look at the sequence of events, you can argue it either way. There's the Schwarzenegger comments in February, and then there's a few months where not much happens. But then you have this May 18th outburst of the repeated statements, you could be a nigger, and my dad called you guys coons, you had to get in the back of a bus, you had to drink water out of a tin can, you never saw a nigger go down the road in an RV, this racist rant. And so then he goes in and complains, and then as a result of that complaint, he's treated worse, and in fact ridiculed for making his complaints. And one of the managers said he thought that he was being overly sensitive and trying to play the race card. And I think that context is one of the facts that a jury should have to evaluate, along with the promotion, along with the dollar an hour raise, and the other context, and it shouldn't be taken from the jury. What was the nature of the promotion? He got a dollar an hour raise in early 07, and then he got a promotion from lot specialist to lot supervisor sometime in June of 07. And is your client's contention that that was a sham, or that it was a meaningless improvement? It's certainly, if I may judge, it's certainly a fact that should be considered, but it doesn't diminish in any way the nature of the hostile work environment under the case law that he's been subjected to previously, and we shouldn't say that somehow you could be paid to endure that. Okay. You've used your time. In fact, we've taken you over by a bit. Let's hear from the other side, and we'll give you a minute to respond, because we have taken you over. Right now, Judge? No, no, no. We'll hear from the other side, but then we'll give you a minute for rebuttal. Yes. Thank you. Judy Geers for the Appellee Sutton Motors. The real issue here is that plaintiff wants a ruling that a single or two instances... Well, it's not a single. It is two. Oh, yeah. I'm sorry. That two or three. Or three, maybe, if we count the S's remarks. So let's say three incidents of a racial slur is enough as a matter of law to get to the jury. And the problem that I see is that appellant doesn't cite a single case that supports that theory. I'm more interested in just figuring out what happened here than in cases, because the way discrimination and retaliation can show up is quite varied, and it would be more helpful for me just to understand what the evidence is in this case. I mean, I understand we've got case law out there. I mean, I don't want to put it off to one side, but it would be more helpful to me to understand what happened. The district court writes, and I'm on page two of the district court order, plaintiff called George Sutton at home that night but did not tell him about the comments. The next day, plaintiff tried to talk to Dave Mole about the incident, but plaintiff claims Mole told him to stay out of my office, U.S.O.B., and slammed the door. I don't read the transcript in the same way the district judge does when the district judge says plaintiff called George Sutton at home that night but did not tell him about the comments. Is that right, that he didn't tell him about the comments? Your Honor, the record indicates that he didn't tell him about the comments that night, but that he tried to tell him about the comments, I believe, the next day. Mr. Sutton was not at work the day the S's comment was made, and the evidence was that he was sick. And so it's unclear from the record whether the you could be a nigger comment that the plaintiff testified that that comment took place on May 18th. Then it's unclear whether the S's comment took place the same day, May 18th or May 19th. The complaint to management was May 18th, 19th, or 20th, if you look at plaintiff's deposition testimony, which is at the supplemental excerpt of record on page 13. Let me read the deposition testimony of the plaintiff. And I'm on page, it's 102 on the deposition pages, it's ER 27, line 9. This is plaintiff talking in his deposition. And I called George at his house, that's Sutton. He was sick. I said, George, I'm very sorry for calling you, but you need to know this, what's going on here. He didn't know. I said, you need to know. And he told me, he said, George tells me, he came back, that's your boss. You listen to everything Dave tells you. I don't have anything to do with this. You go in his office, I'll go in there. When you get to Dave's office, I'll go in there and talk with you guys and get this resolved. That sounds to me that he's telling him about, I mean, who else is he going to be talking about? He says, you need to know this. Yes. I read that as saying he told him about the comments. What else is he going to be calling him about and telling him? Your Honor, the deposition testimony later on, I believe it's S.E.R., the Supplemental Excerpt of Record, page 13. Hang on, hang on. Okay. Where do I look? Just a minute. I'm sorry, Your Honor. At the very top of that page, George told you to go talk to Dave. And, like, when George came back to work on May 19th, he said, go talk to Dave. You went to talk to Dave. You told Dave, we've got issues in service. Tom Locke is calling me a nigger. Yeah. That, by my understanding of the record, was the first time that Mr. Harris indicated exactly what the problem was. To George Sutton, he said, we've got a problem. And George said, you need to go talk to your supervisor. Now, here's what we know that what he told to George, and this is the plaintiff talking, George, I'm very sorry for calling you, but you need to know this. What's going on here? He didn't know. I said, you need to know. And he said, go talk to. Now, I guess I could infer from this that he's worrying about there's not enough, you know, water at the drinking stations. But what he's concerned about, and we know what he's concerned about, is being called a nigger. And so when he says, George, you need to know this, what are we supposed to think he's telling George? The evidence, Your Honor, is that he didn't tell George that night. But he did tell him the next day. What kind of evidence do you have that he didn't tell George that? I'm sorry. I can't point to exactly where it is. And the only evidence I have is this. At least that's the only evidence I'm aware of. It might be the next page, Your Honor. Okay. Put my nose in it. I'm ready. Okay. I'm sorry. ER. Oh, this is in the ER. ER 28. Okay. Page 108. Okay. He wouldn't listen. He told me to go talk to Dave. Dave's my boss. So I couldn't get nowhere with George. So he said, go back off and go talk to Dave. Dave is your boss. Well, wouldn't listen sounds as though I told him, but he wouldn't listen. That's not that I didn't tell him. It's just he wouldn't listen. He says that he said he was being harassed. Wait a minute. Where does that say that? Just below the piece that you read to me, Your Honor. Well, can I just, at the bottom of 106, it says, when you called George at home, did you tell him about the things you're saying that Tom Locke said to you? No. I told him he need to be, there's something not right over there. Tom is just being really racial. So he told him what the issue generally, but he apparently didn't tell him what the exact words were. And thank you, Your Honor, for drawing my attention to that. That's probably what I'm relying on. But, frankly, there's no question that he did alert management shortly, either at the time of the second nigger's set of comments or the day after. The real question is, how did the employer respond to that? And also, well, right, but I, okay, how the employer responded, but would you agree that the use of the term nigger in the workplace is a, especially where, I don't know what the racial composition of the workforce is in this place, is that in the record? I believe that Mr. Harris was the sole black employee at the time. Sole black employee. So it seems to me calling the sole black employee a nigger, knowing that that is such a pejorative term in our culture, so much so that euphemisms are used. The n-word, it's not even used. We're using it openly in this courtroom, but that's, a lot of opinions won't even put it into the opinion. So it does, the question I have is, we have case law that talks about severe and pervasive harassment. There are a limited number of incidents here, although at least one of the tirades was pretty outrageous and sustained, and why wouldn't that be enough to distinguish what's going on here in terms of whether there was harassment from our case law? Well, Your Honor, I think the difference is the promotion. Very shortly after this second tirade, Mr. Harris was promoted to lot supervisor. He was given a 40 percent raise. He went from $11 an hour to $15 an hour, and for the next six months. So it was more than a dollar an hour. Yes, that was his first raise, which happened after the Schwarzenegger, about a month after the Schwarzenegger comment, he received a $1 an hour raise. No evidence that that was in any way related to the Schwarzenegger comment. He just received a $1 raise. Then a couple of months go by, so there's about three months between the Schwarzenegger comment and then this tirade by, I believe, Tom Locke. And then the S's comment happens right around the same time. It's a little unclear. And then within a week or so, Harris is promoted to lot supervisor. And Harris's deposition testimony is that other than the racial incidents that he pointed to, the Schwarzenegger comment and this tirade by Mr. Locke and the S's remark, there were, he believes, this is his deposition testimony, he believes there were no other racially motivated incidents. He says there were no other racial remarks. No one else ever used the word nigger. Nothing happened for six months after he was promoted. And so if we look at the totality of the circumstances, and both of the surviving claims here require that, both the hostile work environment claim and the IIED claim, require that we look at the totality of the circumstances. The totality of the circumstances is that there were these two very dreadful remarks made early in his employment, and the employer responded. It's not clear that the response was directly related to these remarks, but the employer responded by making him a supervisor over some of these people and increasing his pay by 40%. And nothing happened for the next six months. So if we look at the environment in which he's working, it may be unpleasant. There is evidence that Mr. Mole was a pretty, excuse the term, hard-ass supervisor and that he was very hard on everyone. But the plaintiff himself testifies that there were no other racially motivated instances. Now, I hear this argument on your side, and it makes sense to me, I have to say. My problem is whether it makes enough sense that no reasonable fact finder could go the other way. I mean, what we're dealing with is summary judgment. And were this an argument to the jury, I think you've got a pretty good argument. Why do we have to conclude that there was no legal violation here, no illegal harassment and no illegal retaliation? The reason I say it this way is that I'm not sure how sophisticated these defendants were, but we all know that a sophisticated defendant with some knowledge of the law or maybe even just a shrewd defendant with no knowledge of the law but trying to disguise true motivation may delay for a while. I mean, yeah, I'm going to get rid of that N-word person. But before I do, I've got to cover my tracks. So I'm going to keep him around and treat him well for six months, and then I'm going to can him. Well, Your Honor, I can see your point, but there's no evidence in the record that that promotion was anything but merit-based. And so the lack of that and the plaintiff's own testimony that there was no racially motivated behavior after he was promoted should be enough for a district court to rule that there is just not enough to get to the jury here. There are other cases in which black men have been called nigger in the workplace a number of times, and this Court has ruled that that is not enough to get to the jury. I believe the name of the case is Swinton, and it's cited in the briefs. Thank you. Thank you. Would you like a minute? Thank you, Your Honor. To respond to your question about the record in regard to the phone call to Sutton's home, please look at ER 35. That's plaintiff's declaration, and you'll see under paragraph 5, it's about two-thirds of the way down the page there, quote, I also called George Sutton at home to complain about the racial comments, and Sutton told me that there would be a meeting to get it resolved. We never had a meeting to resolve the issues with these comments, end quote. And so I think that fleshes out the deposition testimony. Is that after the deposition testimony that I read? That you pointed out there on ER 28, Judge, about calling at home about the racist issue. I'm sorry. Just the sequencing. The declaration was after the deposition testimony or before? Yes, I believe so. The declaration came after the deposition testimony. Well, we've got a range of possibilities here. Either he specifically tells them about the comments, or he didn't specifically tell them about the comments, but he said Tom's just being really racial. I mean, that's the range in which we're operating. Yes, we have really racial and we have racist comments, and certainly the issue was brought up to Mr. Sutton in the light most favorable to plaintiff. And if I could just leave the court with this one observation, there's some argument in the briefs about what was raised about the state law claims of emotional distress, and it was specifically argued in the summary judgment hearing that the racist comments satisfy a basis for those state law claims, and that's page 1213 of the summary judgment hearing transcript. Thank you. Thank you very much. Thank both sides for your arguments. The case of Harris v. Sutton Motor Sales is now submitted for decision. I should have said before we began, the United States v. Brinkerhoff and the United States v. Adams are on the calendar. They've been submitted on the briefs. The next case on the argument calendar, Shiloh N. v. Grant and Maryland Casualty Company. Thank you.
judges: Bury, Fletcher W. , Fisher